Our third case for this morning is Nathaniel Jackson v. David Willis. We'll hear from Mr. Kelley. Thank you, Your Honor, Counsel. May it please the Court. District courts have considerable but not unlimited discretion whether to grant or deny a motion to continue a trial that is made before that trial. In this case, this is one of the rare cases in which the Court, by its own actions, created and then exceeded the limits of its discretion. How can we hold that the trial court abused its discretion, given that the Court appointed Mr. Radia as standby counsel? The trial is scheduled to allow Mr. Jackson time to familiarize himself with the trial exhibits, with Mr. Radia present, and the Court had concluded that it was a straightforward case and Mr. Jackson knew the facts as well as anyone. The Court also concluded it would never find a lawyer to take Mr. Radia's place at that point, and that the jurors who come from all over that area, many are farmers, could not be reached. They'd given up there that day. How can we say that Judge Bruce abused his discretion? Well, if I may, Your Honor, I'll address those in reverse order. So the question whether the Court abused its discretion because it says that it could or it said that it could not find substitute counsel assumes that it was not going to continue the trial. In fact, the Court had already decided that a month before at the initial pretrial conference on August 26, 2014. I might interject that in the grand effort to keep litigation costs under control, district courts are strongly encouraged to set trial dates early and to make those very firm dates. So in that sense, Judge Bruce was following best practices. Well, it's true, Your Honor, that trial courts have discretion to make sure that their dockets are moving forward apace. Well, and they're encouraged to keep the parties realistic, for example, to keep chances of settlement at their highest, to keep things moving and costs under control. So it sounds like he did something that was extremely unusual or something that's frowned upon. The mere act of denying the continuance certainly was not extremely unusual. What was unusual, however, was convincing Mr. Jackson of the virtues of going forward to trial and then immediately granting the motion of counsel, Mr. Radia, to withdraw. But it wasn't quite immediate because what he does when Mr. Radia pops up the minute Mr. Jackson decides to accept him and Mr. Radia asks to be excused is he does something quite sensible. He says, why don't you two talk to each other for a few minutes, you know, and come back and tell me where we are? And they do, and Mr. Radia renews his motion. That's true, Your Honor. Immediately before that colloquy, the court had taken the time to convince Mr. Jackson that going forward on his own would be like doing surgery on himself. Quite rightly, actually. Agreed, and then secured his agreement to go forward with Mr. Radia, but then didn't circle back and ask Mr. Jackson whether he agreed with that. And, in fact, Mr. Radia made clear that either Mr. Jackson needed additional time to prepare or to obtain substitute counsel, and if he didn't get either of those things, he would be prejudiced. So I think the record is clear that neither Mr. Jackson nor Mr. Radia assumed that what transpired would result in Mr. Jackson having to go forward the next day on his own and represent himself at trial. What prejudice was there other than the fact that Mr. Jackson blundered into some errors that, you know, a lawyer presumably would never have committed? So I don't see, for example, an expert witness that needed to be called. I don't see complexity in this trial. It's really just, you know, what happened. Was he tossed into the van headfirst and was his shoulder hurt, or did they put him in and lock him up appropriately? Well, that's true. Mr. Jackson was familiar with the facts, but he was not prepared to articulate and present a case. If you look at the record of the examination of the two principal witnesses, Mr. Willis, I'm sorry, Officer Willis and Officer Payne, it's clear that he asks open-ended questions. He doesn't ask the sort of direct questions that you would expect and that a lawyer would have asked on cross-examination. But why would another month have made him better at cross-examination? I'm just trying to say, I mean, his flaws are the flaws of any pro se litigant, and that's too bad. I mean, that's why we have lawyers, right? But I don't see additional prejudice. I don't disagree that those flaws manifest themselves with pro se litigants generally. We do have another special circumstance in this case, which is that there is an identification of the other witnesses, for lack of a better term, that was not produced to Mr. Radia, to Mr. Jackson, until Mr. Radia came on the scene. It's unclear from the record whether he got it when the court set the due date on September 2nd or when Mr. Radia said that he received it on the 26th. If it was the 26th, he had five business days before the trial started in order to subpoena these additional witnesses. And the defendants fault Mr. Jackson for not presenting additional witnesses after having not identified them. But he had five business days to subpoena and present these witnesses. These were the other people who apparently would have been occurrence witnesses, seeing how this van transport worked. Correct, Your Honor. They were identified on the roster for the Logan Correctional Facility on the day and assigned to the segregation unit at the Logan facility on the day of the incident. Now, no trial lawyer would subpoena these witnesses without having any idea what they would say and then put them on the stand. So he finds out five business days or perhaps a little bit more, we don't know, that there are these additional witnesses. So that is a concrete thing that Mr. Jackson or another counsel could have done. But to Your Honor's earlier point, it's certainly true that Mr. Jackson could have taken the time to plot out a better examination. He had, depending on how it's counted, maybe nine hours, maybe 13 hours, with the documents to sort of assimilate them and prepare to present his case. So it's true that he had to throw it together, for lack of a better term, and he could have done a better job of that. You also mentioned, Judge Wood, that he blundered into several errors that a lawyer would not have made, and that's absolutely true. And we'd submit that if he had had time to familiarize himself with the rules of evidence, he would not have done that. And certainly if he'd been able to locate substitute counsel, he wouldn't have done that. Well, I'm thinking particularly of opening the door for this May 2007 report coming in. Yes. And the May 2007 report that you're referring to has allegations in it that Mr. Jackson made death threats against prison employees. So those threats were entirely unnecessary to prove the point that the defendants assert they were necessary to prove, which is that the point that the defendants assert is that, look, this 2007 transfer is entirely different from the 2014 transfer, and you can't just say that you're not going to be transferred and that's the end of it. That's never in dispute. Mr. Jackson said in his narrative testimony that, look, in 2007 I was being transferred and I refused it, and because I refused the direct order, I was punished. That's the point that the state says that it needs for this death threat evidence. And instead of using that admission, it introduces this death threat evidence and then hammers it. But didn't defense counsel have a right to explore the circumstances of that transfer? I'm sorry, Judge. I didn't hear the beginning of your question. Wouldn't defense counsel have a right to explore the circumstances of the transfer? Once transfer comes up. I think the answer to your question is maybe, and in this circumstance, no, because the point that was asserted was that a prisoner cannot simply refuse to be transferred, and that wasn't disputed. So the defendants went beyond that and introduced the death threat evidence. Mr. Jackson disputed it. Mr. Jackson thought you had kind of an option to decide what prison you felt like going to. It seemed a little extreme. He had a right to refuse a transfer because he had successfully done so in that May 2007 transfer to Shawnee. I think that's a problem with Mr. Jackson's terminology because if you look at the rest of Mr. Jackson's testimony, Mr. Jackson says that I refused this transfer, and when I did, I was punished for doing so. So he recognizes that he doesn't have an unlimited right. And I see that my light's on, and I'd like to reserve the balance. That's fine. Ms. Hanson. Good morning, and may it please the Court. I'm Assistant Attorney General Christina Hanson representing the defendants. There's no basis for overturning the jury verdict in this case. Mr. Jackson claims that the district court committed three errors that deprived him of a fair trial, but all three of those should be rejected. The thing that worries me most about this sequence is what the trial judge does, what Judge Bruce does after Mr. Radia and Mr. Jackson confer for a minute or two after this initial colloquy. The judge has gone out of his way, admirably, to convince Mr. Jackson that it's a very foolish decision to try to represent yourself. And then Mr. Radia pops up and says, well, actually, I want out anyway. They talk, and the only person the judge talks to at that point is Mr. Radia. He doesn't circle back to Mr. Jackson and say, you know, your lawyer is saying he still wants out, but are you willing to have him as a lawyer? And if Mr. Jackson had reiterated, yes, you know, I'm going to be cooperative, you know, I realize I'm better off, the judge might have denied Mr. Radia's motion to be relieved from representation. And instead of just having Mr. Radia as standby, he might have really had a lawyer who would have understood Rule 402, who would have understood how to limit testimony, who would have known to ask for limiting instructions, who would have, in essence, you know, gotten some of the garbage that Mr. Jackson introduced into this record. It never would have been articulated. So I see that as like the pivotal moment, and I'm very disturbed that the judge didn't actually go back to Mr. Jackson himself and ask him. Well, Your Honor, but if we look at the circumstances of that, the recruited counsel and Mr. Jackson had about 20 minutes to confer. And after that time was up, recruited counsel came back and said, I've had a conversation with Mr. Jackson. It's clear that the impression I formed on Friday has been confirmed today with today's conversation with Mr. Jackson. He fundamentally distrusts me, and basically, we agree that under the circumstances, we cannot work together as attorney and client. So what would be so hard with Judge Bruce turning to Mr. Jackson and saying, Mr. Jackson, is this an accurate report of your feelings? You just told me 20 minutes ago that you wanted to be represented by Mr. Radia. Have you changed your mind? Two seconds. Right, but if we put it in the context of the entire hearing, Mr. Jackson created the situation that put him here in the first place. He filed a motion asking his counsel to withdraw and submitted with it a six-page affidavit detailing his dissatisfaction with his client. So the fact that he had a moment of cold feet in the middle of that, but after 20 minutes of conferring with his recruited counsel, his recruited counsel represented that he and Mr. Jackson agreed that Mr. Jackson would prefer to proceed on his own, satisfied the trial court at that point. And consistent with that statement, Mr. Jackson made no objection at that point to his counsel withdrawing, and it was recruited counsel who asked for additional time, not Mr. Jackson at that point. So I think under an abusive discretion standard, we don't ask what another judge would have done, but whether no reasonable person would have conducted the trial the way that the district court did in these circumstances. But a completely unprepared pro se person, and Mr. Jackson, of course, had already revealed in many ways that he was a difficult individual, to say the least. You put him in and have a trial? I mean, it doesn't really seem very balanced. And I'll tell you what bothers me a bit. The disciplinary report from 2007, from that transfer incident, it was relevant to rebut his denial, perhaps, that the transfer was aborted because of him threatening the guards. But why should the court have then admitted that into evidence by sending it back to the jury? Doesn't that invite a jury to unduly focus on that incident instead of the matter before it and prejudice the defendant greatly? I don't think so, Your Honor, because, first of all, Mr. Jackson, there was a sidebar with respect to the 2007 disciplinary report. Mr. Jackson denied the findings, the Administrative Review Board's findings, and there was a sidebar with respect to how to proceed at that point. The district court weighed the factors on how to proceed and decided that it would be better to just admit the report it had already been testified to, to admit the report and let the jury give it whatever weight it was going to. And Mr. Jackson agreed with that decision. And so at that point, Mr. Jackson waived any argument he had to the admissibility of that report. He agreed that the report should be waived. At that point, his standby counsel also agreed contemporaneously with the testimony and then again at the end of trial when they were looking at which exhibits to send to the jury. Mr. Jackson again said, I'm fine with the jury. I'm okay with that going into evidence. And so at this point, he shouldn't be permitted on appeal to come back and say that that was reversible error. He waived that argument not only at trial, but he also waived that argument on appeal. There's simply no basis for applying a plain error analysis to that issue. And likewise, with respect to the cross-examination testimony, that also was a waived issue, whether defense counsel could be permitted to inquire into the fact of his incarceration. The only extra fact that comes out there was that it was a felony. Is that correct? I mean, he's already said a lot of things in his opening statement. Correct. In his opening statement, he already said that he was locked up for burglary. So they know it's burglary. They know he's in prison. They know he's been in prison for the past 12 years, that he has two years left on his sentence. So he doesn't utter the word felony, but probably most jurors could figure that out. Right. And it's clear to the jury even from the outset of the case, from the statement by the trial court at the opening of the case, that at all relevant times of litigation, he was incarcerated at the Department of Corrections. And so there really is no prejudice from that statement. And additionally, he's the one who brought it up. And that's the same situation with the disciplinary report. It was Mr. Jackson who introduced that evidence and actually tried to use it, tried to introduce the report himself through the defendant's testimony. And then in his own case in chief, he attempted to use that evidence to show that he had some right to refuse transfer and that the defendants, in fact, were acting inappropriately by not allowing him to refuse transfer. And so once he opened the door to that evidence, the trial court was absolutely, it absolutely would have been prejudicial to the defendants to not allow them to pursue that issue in cross-examination. And again- Did Radia remain as, you know, just backup counsel or standby counsel? He did. He remained a standby counsel throughout the proceedings. Did Mr. Jackson consult him at all during the trial? He did. He consulted him throughout the trial. He was permitted, standby counsel assisted with the exhibits and entering exhibits into evidence. He consulted with Mr. Jackson at the end of each witness's testimony. He responded to a post-trial motion on behalf of Mr. Jackson, which, of course, was outside the jury's hearing. And he consulted with Mr. Jackson throughout the trial. And so he did assist at the trial and throughout the proceedings. You know, and I think it's important to note here as well with respect to the district court's discretion in not granting the continuance that there were valid considerations that the district court was looking at. As Judge Wood pointed out, district courts are permitted to look at their civil docket and take into consideration the court's calendar and the inconvenience on potential jurors, the inconvenience on the parties, on third-party witnesses. And those are the factors that fueled the district court's decision. And against that, Mr. Jackson came in. He had filed a motion to have his counsel withdraw. He asked at the hearing that his counsel withdraw. Indeed, he filed an affidavit that referenced disagreements with his counsel dating back to September 12th, a couple of weeks before this issue came up. It was Mr. Jackson's decision to raise this issue on the eve of trial, on the afternoon before trial. And the trial, while the district judge went to lengths to explain to Mr. Jackson that there was no way that he could recruit substitute counsel for him and there was no way to delay the trial at that late stage, after consultation with his recruited counsel, Mr. Jackson and counsel agreed that Mr. Jackson would withdraw. Well, I mean, he could have delayed the trial. He was the judge after all. He just didn't want to because of all of the wheels that had been set in motion, whether it was the jurors traveling to the courthouse or whether it was the equipment that he had ordered or whether it was his own calendar. There were a number of factors. He just thought it was inappropriate to push it back. And that, Your Honor, was well within the district court's discretion. And I would also like to address, because Mr. Jackson's counsel raised this discovery issue and that this was a special circumstance, that Mr. Jackson should have been permitted an extension so that he could conduct discovery. But there had been a hearing on September 26th relating to discovery, and the district court asked recruited counsel if he had received all the discovery that he needed. And on that September 26th date, recruited counsel expressed to the court that discovery was a dead issue. If there was a time to ask for a continuance with respect to discovery, that would have been it. However, recruited counsel represented to the court that discovery was a dead issue. And here on appeal, Mr. Jackson's counsel argues that he could have presented more evidence or he could have subpoenaed trial witnesses. But the fact is that all he's offering is his own speculation on that point. He hasn't offered any affidavit or anything suggesting who he would have called and what that witness would have said and how it would have changed, how it would have affected the jury. He's offering only his own speculation, and that's not a basis for overturning the jury's verdict. For those reasons and the reasons set forth in our brief, we ask that you affirm. All right, thank you very much. Anything further, Mr. Kelly? With respect to the discovery, counsel just said that if there was a time to ask for a continuance, that would have been it. Mr. Jackson filed a document that explained that one of the issues that led to this breakdown with Mr. Radia was Mr. Radia's failure to follow up on the discovery that he had just received. So it's sort of a catch-22 that the defendants have put Mr. Radia and Mr. Jackson in, that, okay, we're going to give you this either a month or five days, five business days before the trial, and then we're going to fault you for not following up on that. That's just not fair. He had never asked for anyone who was in the transfer area near the transport van, not even their names? He'd asked for that from the very beginning of the case. He'd filed multiple motions to compel, multiple motions for sanctions. So what was Mr. Radia talking about when he said all the discovery was produced? Well, finally, after Mr. Radia appears on the scene, Mr. Jackson gets these documents. So he knows their names, and he doesn't ask Mr. Radia to get them subpoenaed? Well, we don't know what he did or didn't ask Mr. Radia. That's not in the record. But what we do know is that Mr. Jackson complained about Mr. Radia's failure to follow up on that. Mr. Radia expressed to the court that there's a disagreement as to trial strategy. It's a clear strategy decision that should be allocated to the client, and it's clear that Mr. Radia and Mr. Jackson assumed that either the court would give additional time so that if Mr. Jackson wasn't going to get additional counsel, he could do that discovery himself. Because, again, he'd been seeking these documents and this information from the very beginning of the trial, and it's somewhat egregious that he doesn't get the names of the principal witnesses until he gets an appointed lawyer. And then he gets an appointed lawyer, but the lawyer doesn't go follow through and subpoena these witnesses. And I think it's understandable that Mr. Jackson looks at this situation and says, I don't like what's happening here. I want to either represent myself or get substitute counsel. And he wasn't offered an opportunity to do that. To a point that counsel made at the beginning, she said that Mr. Jackson made no objection to continuing to represent himself. Mr. Radia made that objection on Mr. Jackson's behalf. Mr. Radia made clear that Mr. Jackson would be, quote, severely prejudiced if he were forced to go forward with trial on the schedule that had been preordained. So that's not an objection that had been waived. With respect to the 2007 report, counsel said that the court had already decided that it would be better to admit it because it was already in. Well, that's right. The damage was done, and the court compounded the damage by sending the document back and saying that the jury could make whatever determinations that it would make with respect to that document. Well, this is all in conjunction with whether there should be a Gilbert instruction, which wouldn't have helped Mr. Radia much either. I'm sorry, Mr. Jackson much. I'm sorry, you said the Gilbert? I thought he sent the report back in lieu of giving the Gilbert statement, but I'm reflecting that the Gilbert statement would not have helped Mr. Jackson very much either because that stems from Edwards against Balasag and the rest of that line of cases. I think that the Gilbert instruction would have helped him more than sending the document back and then allowing the defendants to hammer on that issue at least three times during the closing arguments. And I'd go back to the point that it's not necessary because Mr. Jackson didn't contest that he had this unlimited right to be able to refuse a transfer. This is an abuse of discretion case at heart, but there are, as there must be, limits to that discretion. And we submit that in this case, this is one of the rare cases in which those limits were met and exceeded. And so we respectfully request that the verdict below be reversed and the matter remanded for a new trial. All right, thank you very much. And you were appointed, were you not, Mr. Kelly? I'm sorry? You were appointed to this case? Yes, we are. We thank you and your firm very much for your efforts. On behalf of your client, thanks as well to the state. We'll take the case under advisement, and the court is going to take a 10-minute recess right now.